# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MARGARET LONG,            ) | |
|                            ) | |
|         *Plaintiff*        ) | |
|                            ) | |
| *v.*                     ) | *No. 1:09-cv-592-GZS* |
|                            ) | <u>*FILED UNDER SEAL*</u> |
| FAIRBANK FARMS, INC., et al.,   ) | |
|                            ) | |
|       *Defendants and*    ) | |
|       *Third-Party Plaintiffs*  ) | |
|                            ) | |
| *v.*                     ) | |
|                            ) | |
| GREATER OMAHA PACKING  ) | |
| COMPANY, INC.,           ) | |
|                            ) | |
|    *Third-Party Defendant*  ) | |

**************************************************************************

| | |
|---|---|
| ALICE SMITH,             ) | |
|                            ) | |
|         *Plaintiff*       ) | |
|                            ) | |
| *v.*                     ) | *No. 2:10-cv-60-GZS* |
|                            ) | <u>*FILED UNDER SEAL*</u> |
| FAIRBANK FARMS, INC., et al.,   ) | |
|                            ) | |
|       *Defendants and*    ) | |
|       *Third-Party Plaintiffs*  ) | |
|                            ) | |
| *v.*                     ) | |
|                            ) | |
| GREATER OMAHA PACKING  ) | |
| COMPANY, INC.,            ) | |
|                            ) | |
|    *Third-Party Defendant*  ) | |

***MEMORANDUM DECISION ON MOTION TO EXCLUDE AND
RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT***

The Fairbank Farms, Inc. third-party plaintiffs (collectively, "Fairbank") move for summary judgment on their indemnification claims against third-party defendant Greater Omaha Packing Company, Inc. ("GOPAC"), while GOPAC moves for summary judgment or, in the alternative, partial summary judgment with respect to all of Fairbank's claims against it. *See* Fairbank's Motion for Summary Judgment ("Fairbank's S/J Motion") (Docket No. 113, *Long*; Docket No. 91, *Smith*) at 1-2; Third-Party Defendant GOPAC's Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("GOPAC's S/J Motion") (Docket No. 116, *Long*; Docket No. 94, *Smith*) at 1. GOPAC also moves to exclude, in whole or in part, opinion evidence of Fairbank's experts on the basis that it is unreliable. *See generally* Motion To Exclude Expert Opinion ("Motion To Exclude") (Docket No. 112, *Long*; Docket No. 90, *Smith*).[1] For the reasons that follow, I deny GOPAC's motion to exclude and recommend that the court deny both Fairbank's and GOPAC's motions for summary judgment.

## I. Motion To Exclude

### A. Applicable Legal Standard

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[1] The plaintiffs have dismissed with prejudice all of their claims against both Fairbank and GOPAC. *See* Docket No. 181, *Long*; Docket No. 158, *Smith*.

Fed. R. Evid. 702. Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." *Beaudette v. Louisville Ladder, Inc*., 462 F.3d 22, 25 (1st Cir. 2006). With respect to reliability:

> In *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)], the Supreme Court set forth four general guidelines for a trial judge to evaluate in considering whether expert testimony rests on an adequate foundation: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline. However, these factors do not constitute a definitive checklist or test, and the question of admissibility must be tied to the facts of a particular case.

*Id.* (citations and internal quotation marks omitted); *see also, e.g., Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) ("The court's assessment of reliability is flexible, but an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.") (citation and internal quotation marks omitted).

As the First Circuit has observed, "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (citation and internal quotation marks omitted). "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id*. (citation and internal quotation marks omitted). That said, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz-Troche v. Pepsi Cola of P.R.*

*Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citation and internal quotation marks omitted).

## B. Discussion

GOPAC seeks to exclude (i) the opinions of all four of Fairbank's experts concerning an asserted connection between the strain of *E. coli* O157:H7 found in Fairbank's products and a strain of that bacteria found on regulatory inspection in meat products manufactured by a different meat fabricator, Culver City Meat Packing Company ("Culver City") in California, and (ii) the opinions of all four experts in their entirety on the ground that those experts were provided incomplete and misleading records. *See* Motion To Exclude at 1-7. For the reasons that follow, the motion is **DENIED**.

### 1. Opinions Bearing on the Culver City Evidence

Fairbanks' experts' Culver City theory has its origins in the following facts, about which there is no dispute:

1. On September 22, 2009, the United States Department of Agriculture ("USDA") took a regulatory sample at Culver City that tested positive for *E. coli* O157:H7. *See* Motion To Exclude at 2; Fairbank's Brief in Opposition to GOPAC's Motion To Exclude Expert Opinion ("Exclude Opposition") (Docket No. 142, *Long*; Docket No. 119, *Smith*) at 2.

2. The Culver City strain was determined to be a genetic match to the E. coli strain associated with the outbreak of E. coli that sickened the plaintiffs in these cases. *See id*.[2]

3. During the relevant periods, GOPAC was the only common supplier to both Fairbank and Culver City. *See id*.

---

[2] GOPAC describes this as an alleged match but does not dispute that such a finding was made. *See* Motion To Exclude at 2.

GOPAC seeks exclusion of any Fairbank expert testimony concerning the Culver City evidence on the ground that Fairbank fails to offer any plausible scientific explanation for the seeming link in the two bacterial findings. *See* Motion To Exclude at 1-5; Third-Party Defendant GOPAC's Reply in Support of Its Motion To Exclude Expert Opinion ("Exclude Reply") (Docket No. 159, *Long*; Docket No. 136, *Smith*) at 1-5. Nonetheless, the Culver City evidence on its face constitutes a sufficiently reliable scientific basis, in the form of both microbiological and epidemiological findings, for expert testimony linking GOPAC to bacteria found in both Fairbank's and Culver City's meat products. To the extent that GOPAC criticizes Fairbank's proffered explanations for the link as predicated on erroneous factual assumptions, *see* Exclude Reply at 1-5, those criticisms go to the weight, rather than the admissibility, of the challenged expert opinions, *see, e.g., Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007) ("Objections of this type, which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility. As such, these matters are for the jury, not for the court. This is as it should be; the district court's gatekeeping function ought not to be confused with the jury's responsibility to separate wheat from chaff.") (citations and footnote omitted); *Brown v. Wal-Mart Stores, Inc.,* 402 F. Supp.2d 303, 308 (D. Me. 2005) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [that] such testimony [must] be excluded on foundational grounds.") (citations and internal quotation marks omitted).[3]

---

[3] GOPAC initially sought to exclude the Culver City evidence on the basis that Fairbank's experts relied on a (*continued on next page*)

GOPAC's bid to exclude all testimony of Fairbank's experts bearing on the Culver City evidence therefore is **DENIED**.

## 2. All Expert Opinions

GOPAC seeks to exclude the testimony of all of Fairbank's experts in its entirety on the bases that (i) prior to the formation of their opinions, Fairbank failed to provide its experts the voluminous discovery produced in Mayville, New York, on October 14-15, 2010 (the "Mayville Discovery"), which included handwritten plant production records and a Notice of Intended Enforcement ("NOIE") issued to Fairbank by the USDA Food Safety and Inspection Service ("FSIS") in the wake of the *E. coli* O157:H7 outbreak at issue, and (ii) the Fairbank records on which the experts relied are "hopelessly unreliable." Motion To Exclude at 6-7.

"[A]n expert's opinion need only be based upon sufficient facts or data, not perfectly consistent with every piece of available evidence." *Bartlett v. Mutual Pharm. Co.*, 742 F. Supp.2d 182, 194 (D.N.H. 2010) (citation and internal quotation marks omitted). "Emphasizing inconsistencies between an expert's opinions and the evidence, of course, is one of the principal purposes of expert cross-examination." *Id.* Fairbank's experts' opinions are based on sufficient facts and data. Each of Fairbank's experts testified that he had been provided adequate information

---

scientifically unreliable "plant colonization" theory to explain how a genetically identical strain of *E. coli* O157:H7 bacteria could have been found in meat produced on July 25, 2009, for Culver City and on September 11, 2009, nearly two months later, for Fairbank. *See* Motion To Exclude at 1-5. In response, Fairbank backed away from the "plant colonization" theory, stating that (i) new evidence showed that the Culver City meat actually was produced on the same day as the Fairbank meat, September 11, 2009, and, (ii) alternatively, even if the Culver City meat was produced on July 25, 2009, Fairbank had evidence indicating that common feed lots supplied cattle slaughtered to produce both the Culver City and Fairbank meat, a circumstance that could explain the presence of the same strain of bacteria on the two disparate dates. *See* Exclude Opposition at 7-9. In reply, GOPAC vigorously disputed the validity of the factual underpinnings of Fairbank's latest explanations for the link. *See* Exclude Reply at 1-5. If GOPAC is correct, its assertions call into question the value of the Culver City evidence in linking GOPAC to the outbreak. Nonetheless, as noted above, the Culver City evidence itself forms a sufficiently reliable basis for expert testimony on the subject.

to render his expert opinion. *See* Videotaped Deposition of Alan L. Melnick, M.D., M.P.H., C.P.H. (Docket No. 142-3, *Long*; Docket No. 119-3, *Smith*), Exh. 2 to Affidavit of Ralph A. Weber ("Weber Aff./Exclude") (Docket No. 142-1, *Long*; Docket No. 119-1, *Smith*), at 54; Videotaped Deposition of James L. Marsden, Ph.D. ("Marsden Dep./Exclude") (Docket No. 142-4, *Long*; Docket No. 119-4, *Smith*), Exh. 3 to Weber Aff./Exclude, at 71; Videotaped Deposition of Thomas J. Hoffman (Docket No. 142-5, *Long*; Docket No. 119-5, *Smith*), Exh. 4 to Weber Aff./Exclude, at 91; Videotape[d] Deposition of Lee H. Harrison, M.D. ("Harrison Dep.") (Docket No. 142-6, *Long*; Docket No. 119-6, *Smith*), Exh. 5 to Weber Aff./Exclude, at 24.

In addition, in the wake of the Mayville Discovery, Fairbank provided its experts with CDs containing additional records, including copies of the NOIE issued to Fairbank and Fairbank's response. *See* Exclude Opposition at 5. At his deposition, Dr. Marsden testified that he had not focused on deficiencies at the grinding plant (Fairbank) because he did not think anyone involved believed the grinding plant was a source of contamination. *See* Marsden Dep./Exclude at 75-76. At his deposition, Dr. Harrison testified that, in reviewing the CDs provided following the Mayville Discovery, he "didn't find anything . . . related to my opinions" or that would "modify my opinion." Harrison Dep. at 36-37.

With respect to the asserted recordkeeping deficiencies, GOPAC points to several examples, including a "sizable discrepancy" in Fairbank's records with respect to one of the production days associated with the outbreak, in which the records purported to show that Fairbank used 4,732 pounds of meat received from GOPAC when that meat had a gross weight of only 2,100 pounds. *See* Motion To Exclude at 6-7. GOPAC elaborates on the point in its reply brief, supplying an "overuse table" illustrating additional instances of overestimation of GOPAC meat products used to fabricate

Fairbank's products on relevant days.  *See* Exclude Reply at 6-7; Table (Docket No. 161-2, *Long*; Docket No. 138-2, *Smith*), Exh. 6 to Affidavit of Susan L. Stryker, Esq. (Docket No. 161, *Long*; Docket No. 138, *Smith*).  GOPAC argues that there is no reliable way to determine from Fairbank's records what product, GOPAC or other, was used on the days in question.  *See* Exclude Reply at 7.

It is not clear that these meat usage recordkeeping discrepancies undermine the finding that at least some GOPAC meat was used in key batches of products manufactured by Fairbank on the relevant days.  In any event, Fairbank's experts relied not only on Fairbank's own production records but also on other evidence, including USDA findings, GOPAC's production records, records of other suppliers to Fairbank, and the Culver City evidence.  *See* Expert Report of James L. Marsden, Ph.D. (Docket No. 112-3, *Long*; Docket No. 90-3, *Smith*), Exh. 1A to Defendants' and Third-Party Plaintiffs' Rule 26(a)(2) Expert Witness Disclosures ("Expert Witness Disclosures"), attached as Exhs. 2-2(c) to Affidavit of Alison A[.] Denham, Esq. (Docket No. 112-1, *Long*; Docket No. 90-1, *Smith*), at [5]-[6];  Expert Report of Thomas J. Hoffman (Docket No. 112-4, *Long*; Docket No. 90-4, *Smith*), Exh. 2A to Expert Witness Disclosures, at 4-16; Expert Report of Lee H. Harrison, M.D. (Docket No. 112-5, *Long*; Docket No. 90-5, *Smith*), Exh. 3A to Expert Witness Disclosures, at 3-4; Expert Report of Alan Melnick, M.D., M.P.H., C.P.H. (Docket No. 112-6, *Long*; Docket No. 90-6, *Smith*), Exh. 4A to Expert Witness Disclosures, at 2-4.

In these circumstances, GOPAC's criticisms go to the weight, rather than the admissibility, of Fairbank's experts' opinions.  *See, e.g., Crowe*, 506 F.3d at 18; *Brown*, 402 F. Supp.2d at 308.

## II. Motions for Summary Judgment

### A. Applicable Legal Standards

### 1. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal

punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc*., 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co*., 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.* Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

### 2. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply

statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## B. Fairbank's Summary Judgment Motion

### 1. Factual Background

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of GOPAC as nonmovant, reveal the following relevant facts.[4]

Gerald Zirnstein, Ph.D., is a Senior Scientist with IEH. Fairbank's Statement of Material Facts Supporting Its Motion for Summary Judgment ("Fairbank's SMF") (Docket No. 113-1, *Long*;

---

[4] To the extent that I have incorporated one of the party's qualifications into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.

Docket No. 91-1, *Smith*), attached to Fairbank's S/J Motion, ¶ 1; Third-Party Defendant GOPAC's Opposing Statement of Material Facts and Statement of Additional Material Facts ("GOPAC's Opposing SMF") (Docket No. 138, *Long*; Docket No. 116, *Smith*) ¶ 1.  Dr. Zirnstein received his Ph.D. in food science from the University of Nebraska in 1996, after having worked 10 years as a meat cutter and Quality Control Inspector at a Kansas meat facility.  *Id*.  He worked for the CDC [Centers for Disease Control and Prevention] from 1997-2001 and for the USDA FSIS from 2001 to 2010, when he joined IEH.  *Id*.[5]

Dr. Zirnstein's salary from IEH is covering his work as an expert for GOPAC.  *Id*. ¶ 2.  Dr. Zirnstein understood that his job with the lawyers was to look at any and all explanations for what happened with Fairbank's recall.  *Id*. ¶ 3.[6]  Dr. Zirnstein considers himself an expert in tracing the source of bacteria that sickened the consumers in the instant case.  *Id*. ¶ 4.  He agrees that an appropriate methodology for trying to identify the source of bacteria is to trace back from the consumer to the grind plant and then to look in the grind plant to find out what raw materials went into the hamburger grind at issue.  *Id*. ¶ 5.  Dr. Zirnstein agrees that the only logical conclusion for the source of the bacteria is that it was introduced into Fairbank's facility in one of the raw materials Fairbank purchased.  *Id*. ¶ 6.

Dr. Zirnstein initially testified that he could not clearly identify which of Fairbank's suppliers

---

[5] My recitation includes GOPAC's qualification.  I omit Fairbank's description of IEH as "GOPAC's outside laboratory," Fairbank's SMF ¶¶ 1-2, which GOPAC disputes, GOPAC's Opposing SMF ¶¶ 1-2.

[6] GOPAC qualifies this statement, asserting that Dr. Zirnstein's task was to "analyze all the data" and that, since his deposition, he has been provided with additional records that Fairbank produced only after he had issued his report and been deposed that contain "significant information relevant to the defense of GOPAC" and are "pertinent to the causation analysis as to other suppliers, such as Long Prairie."  GOPAC's Opposing SMF ¶ 3; Videotaped Deposition of Gerald Zirnstein, Ph.D. ("Zirnstein Dep.") (Docket No. 113-4, *Long*; Docket No. 91-4, *Smith*), Exh. 2 to Affidavit of Ralph A. Weber ("Weber Aff./Fairbank S/J Motion") (Docket No. 113-2, *Long*; Docket No. 91-2, *Smith*), at 50; Affidavit of Gerald Zirnstein ("Zirnstein Aff.") (Docket No. 138-8, *Long*; Docket No. 116-8, *Smith*), Exh. 2 to GOPAC's Opposing SMF, ¶¶ 3-5.

was the clear source of the bacteria because there were "problems with several suppliers," including GOPAC, BPI, Uruguay, and "various other" suppliers. *Id.* ¶ 7.[7] Dr. Zirnstein uses "clearly" as equivalent to "probable" or "probably." *Id.* ¶ 8.[8]

Dr. Zirnstein analyzed the trace-back work done by Fairbank's expert, Thomas Hoffman. *Id.* ¶ 9. Dr. Zirnstein agreed that Hoffman built a "fairly solid" case that GOPAC was a source of the bacteria in question. *Id.* ¶ 10. He further agreed that Fairbank's experts Melnick, Hoffman, "and some of the others had pretty good evidence pointing towards GOPAC." *Id.*[9]

Dr. Zirnstein first identified two suppliers, GOPAC and Beef Products, Inc. ("BPI"), as having the strongest link to the incidents because both suppliers' materials were used in the key batches under examination. *Id.* ¶ 11. Dr. Zirnstein then agreed that, on closer examination, the raw materials from GOPAC were all produced on the same day (September 11, 2009), while the BPI

---

[7] My recitation includes GOPAC's qualification.

[8] GOPAC purports to qualify this statement, asserting that an issue of fact exists as to the meaning of Dr. Zirnstein's use of the word "clearly." GOPAC's Opposing SMF ¶ 8. Yet, it is reasonably clear, based on the testimony that GOPAC cites, that Dr. Zirnstein did equate "clearly" with "probable" or "probably." Zirnstein Dep. at 96.

[9] GOPAC qualifies this statement, GOPAC's Opposing SMF ¶ 10, pointing to (i) Dr. Zirnstein's statement that, since his deposition, he has been provided with additional records containing significant information relevant to GOPAC's defense and pertinent to the causation analysis as to other suppliers, such as Long Prairie, Zirnstein Aff. ¶¶ 3-5, (ii) Dr. Zirnstein's conclusion in a November 11, 2010, report that Hoffman "built what was apparently a solid case in regard to GOP[AC] being the major source of *E. coli* O157:H7 contamination in the Fairbanks Farms recall in the fall of 2009" but that "closer examination reveals that several other suppliers to Fairbanks Farms had questionable production, validation and testing records that undermine the case against GOP[AC] as the sole possible source of infected product[,]" Reports/Summary ("Zirnstein Report") (Docket No. 113-3, *Long*; Docket No. 91-3, *Smith*), Exh. 1 to Weber Aff./Fairbank S/J Motion, at 16, and (iii) a January 18, 2011, correction to Dr. Zirnstein's deposition testimony, *see* Corrections to Deposition ("Zirnstein Dep. Corr.") (Docket No. 138-3, *Long*; Docket No. 116-3, *Smith*), Exh. B to Affidavit of Alison A[.] Denham (Docket No. 138-1, *Long*; Docket No. 116-1, *Smith*), Exh. 1 to GOPAC's Opposing SMF, at 1 (pertaining to Zirnstein Dep. at 135, line 3). Dr. Zirnstein originally had stated, in response to a question whether GOPAC "probably would have been the source" if Dr. Zirnstein had seen commonality in certain feed lots, "Great likelihood. Great possibility, yes." Zirnstein Dep. at 134-35. He corrected this testimony as follows: "Great possibility, but definitely not certain when considering the further evidence presented in my report outside of the Hoffman report." Zirnstein Dep. Corr. at 1 (pertaining to Zirnstein Dep. at 135, line 3). He gave as a reason for the correction: "During this line of questioning I had it in my mind that we were primarily discussing the limited data and viewpoint of the Hoffman report, not the entire universe of data which would also include the analyses in my final report." *Id.*

materials were produced on three days.  *Id*. ¶ 12.[10]  Given that the BPI raw materials were produced

on multiple days, Dr. Zirnstein knows of no scientific basis to believe that the bacteria in question

could be traced back to BPI.  Fairbank's SMF ¶ 13; Zirnstein Dep. at 124.[11]  As a scientist, Dr.

Zirnstein agrees that GOPAC is the probable source of the bacteria at issue, with BPI only a possible

source.  Fairbank's SMF ¶ 14; Zirnstein Dep. at 127.[12]

GOPAC experts David W.K. Acheson, M.D., F.R.C.P., Deloran M. Allen, Ph.D., and

Mansour Samadpour, Ph.D., are of the opinion, based on the records and information available, that

it cannot be determined which supplier was the most likely source of the *E. coli* O157:H7

contamination in the ground beef produced by Fairbank that led to the outbreak and the illnesses of

the plaintiffs.  Statement of Additional Material Facts ("GOPAC's Additional SMF"), commencing

on page 8 of GOPAC's Opposing SMF, ¶ 8; Affidavit of David W.K. Acheson, M.D., F.R.C.P.

("Acheson Aff.") (Docket No. 138-11, *Long*; Docket No. 116-11, *Smith*), Exh. 5 to GOPAC's

---

[10] My recitation includes GOPAC's qualification, minus its argumentative statement that no foundation was laid that Dr. Zirnstein had any knowledge of when the BPI materials were produced.

[11] GOPAC purports to deny this statement, GOPAC's Opposing SMF ¶ 13, but the materials cited do not controvert it. Those materials address the reasons why, in Dr. Zirnstein's opinion, BPI's testing may have failed to reveal the presence of *E. coli* O157:H7, Zirnstein Dep. Corr. at 3-6, not the question of whether there is a scientific basis to believe that the same genetic strain of bacteria could be in BPI products produced on three different dates.

[12] GOPAC purports to deny this statement, GOPAC's Opposing SMF ¶ 14, on the bases that (i) in the cited portion of his deposition, Dr. Zirnstein testified that, as between GOPAC and BPI, BPI was "less likely" to be the probable source of the bacteria, Zirnstein Dep. at 127, (ii) elsewhere in his deposition, Dr. Zirnstein testified that there was a probability that other suppliers were responsible, although he could identify no single company other than GOPAC as the probable source, *id*. at 94-95, and (iii) since his deposition, Dr. Zirnstein has been provided with additional records that contain "significant information relevant to the defense of GOPAC" and are "pertinent to the causation analysis as to other suppliers, such as Long Prairie[,]"Zirnstein Aff. ¶¶ 3-5.  The deposition testimony cited by Fairbank supports the statement made: Dr. Zirnstein testified that it would be fair to say that, "whereas GOPAC and BPI originally were the two, now it's GOPAC as the probable source and BPI as a possible source[.]"  Zirnstein Dep. at 127.  Even in the other deposition testimony cited by GOPAC, Dr. Zirnstein agrees that GOPAC is the only company among relevant suppliers to Fairbank that is the probable source of the bacteria.  *Id*. at 94-95.  While Dr. Zirnstein stated, in a post-deposition affidavit, that he had received significant information pertinent to causation analysis, he never stated that he had formed a new opinion regarding causation or that GOPAC no longer was not the probable source of the bacteria.  Zirnstein Aff. ¶¶ 3-5.

Opposing SMF, ¶ 4; Affidavit of Deloran M. Allen, Ph.D. ("Allen Aff.") (Docket No. 138-13, *Long*; Docket No. 116-12, *Smith*), Exh. 6 to GOPAC's Opposing SMF, ¶ 5; Affidavit of Mansour Samadpour, Ph.D. ("Samadpour Aff.") (Docket No. 138-17, *Long*; Docket No. 116-13, *Smith*), Exh. 7 to GOPAC's Opposing SMF, ¶ 4.[13]

In those experts' opinion, based on the records and information available, it cannot be determined that the beef trim supplied by GOPAC to Fairbank was more probably than not the source of the *E. coli* O157:H7 contamination of the ground beef produced by Fairbank that led to the outbreak and illnesses of the plaintiffs. GOPAC's Additional SMF ¶ 9; Acheson Aff. ¶ 5; Allen Aff. ¶ 6; Samadpour Aff. ¶ 5.[14]

## 2. Discussion

In its operative third-party complaints in both *Long* and *Smith*, Fairbank brings three claims against GOPAC, seeking common-law and contractual contribution and indemnification with respect to the plaintiffs' claims of strict products liability (Count One), breach of warranty (Count Two), and negligence (Count Three). *See* First Amended Third-Party Complaint ("Third-Party Complaint") (Docket No. 52, *Long*) ¶¶ *43-67*; (Docket No. 23, *Smith*) ¶¶ 45-72. It seeks summary judgment with respect to its claims of contractual indemnification on the bases that (i) Dr. Zirnstein's admission is binding on GOPAC, (ii) Dr. Zirnstein admitted that GOPAC was the probable source of the bacteria that caused the so-called "Northeast Outbreak," and (iii) by the terms of the parties' unambiguous contract, GOPAC must indemnify Fairbank and hold it harmless. *See* Fairbank's S/J Motion at 2-7.

---

[13] Fairbank denies this, Fairbank's Reply Statement of Material Facts ("Fairbank's Reply SMF") (Docket No. 171-1, *Long*; Docket No. 148-1, *Smith*), ¶ 8; however, I view the cognizable evidence in the light most favorable to GOPAC, as nonmovant.

[14] Fairbank denies this, Fairbank's Reply SMF ¶ 9; however, I view the cognizable evidence in the light most favorable to GOPAC, as nonmovant.

GOPAC disputes each of these propositions. *See* Third-Party Defendant GOPAC's Opposition to Defendant and Third-Party Plaintiff Fairbank Farms' Motion for Summary Judgment ("GOPAC's S/J Opposition") (Docket No. 137, *Long*; Docket No. 115, *Smith*) at 1.

I agree with Fairbank that Dr. Zirnstein admitted that GOPAC was the probable source of the bacteria and that this admission is not undermined by his later affidavit or other evidence cited by GOPAC. Nonetheless, GOPAC is correct that the admission is not a binding judicial admission and that it adduces sufficient evidence to generate a genuine issue of material fact as to whether GOPAC was the probable source of the bacteria. Hence, Fairbank's bid for partial summary judgment should be denied.[15]

### a. The Nature of Dr. Zirnstein's Testimony

As a threshold matter, GOPAC argues that Dr. Zirnstein never clearly testified that GOPAC was the probable source of the bacteria at issue and, in any event, he has since received additional information pertinent to causation analysis as to other Fairbank suppliers, such as Long Prairie. *See id*. at 2-4. GOPAC points out that Dr. Zirnstein testified during the same deposition in which he made the alleged admission that (i) he could not identify the probable source because there were problems with several suppliers and (ii) there was a "probability" that other suppliers besides GOPAC were responsible. *See id*. at 3. GOPAC states that, consistent with that testimony, Dr. Zirnstein submitted a post-deposition affidavit swearing that (i) based upon the information available at the time of his deposition, he believed that there was a far greater likelihood that other potential sources in the aggregate caused the *E. coli* O157:H7 contamination at issue, and (ii) during his

---

[15] I need not and do not reach Fairbank's final argument that, in view of Dr. Zirnstein's binding admission, the parties' operative contract entitles it to indemnification.

deposition, he was not asked about the comparative likelihood of GOPAC as the source of the *E. coli* O157:H7 contamination as against all other suppliers. *See id.* at 3-4; Zirnstein Aff. ¶ 2.

Nonetheless, as Fairbank points out, see Fairbank's Reply Brief in Support of Its Motion for Summary Judgment ("Fairbank's S/J Reply") (Docket No. 171, *Long*; Docket No. 148, *Smith*) at 5, Dr. Zirnstein *was* asked about the comparative likelihood of GOPAC as the source of the contamination as against all other suppliers. Although Dr. Zirnstein initially testified at deposition that he could not identify which of Fairbank's suppliers was the clear source of the bacteria because there were problems with several, he conceded over the course of his deposition that the probable source was GOPAC and that any other potential source was either unlikely or a mere possibility. *See* Fairbank's SMF ¶¶ 7-12; GOPAC's Opposing SMF ¶¶ 7-12; Fairbank's SMF ¶¶ 13-14; Zirnstein Dep. at 124, 127. Only after considering and excluding all possible suppliers except GOPAC and BPI did Dr. Zirnstein testify that, as between those two suppliers, GOPAC was the probable source. *Id*.

Even if, during and after his deposition, Dr. Zirnstein believed, and would have testified if asked, that other suppliers *in the aggregate* more likely were the potential source of bacteria than GOPAC, he clearly stated during his deposition that GOPAC was the only probable single source of the bacteria. *See* Fairbank's SMF ¶ 14; Zirnstein Dep. at 127. Nothing in Dr. Zirnstein's post-deposition affidavit amends or contradicts that conclusion. *See generally* Zirnstein Aff.

As Fairbank notes, *see* Fairbank's S/J Reply at 1-2, the Vaccine Act case upon which GOPAC relies for the proposition that Fairbank must prove that GOPAC was a more probable source than all other potential sources combined, *Lewis v. Secretary of Dep't of Health & Human Servs.*, No. 90-1306V, 1991 WL 262943, at *4 (Cl. Ct. Spec. Mstr. Nov. 25, 1991), *see* GOPAC's S/J

Opposition at 4 & n.4, was remanded with respect to that point. The reviewing court held that the burden of the respondent Department of Health and Human Services, in rebutting a presumption that injury was caused by a vaccine, was to show that one or more defined non-vaccine-related illnesses or factors more probably than not caused the injury. *See Lewis v. Secretary of Dep't of Health & Human Servs.*, 26 Cl. Ct. 233, 238 (Cl. Ct. 1992) ("[T]he special master incorrectly obligated respondent to adduce clear-cut evidence of a non-vaccine cause. Respondent is not required to prove that its espoused cause is more likely than all other potential causes combined."). Consistent with this corrected Vaccine Act standard, Dr. Zirnstein testified, in effect, that, among several potential sources, one more probably than not caused the plaintiffs' injuries. *See* Fairbank's SMF ¶ 14; Zirnstein Dep. at 127.[16]

### b. Nature, Consequences of Admission

Fairbank urges the court to deem Dr. Zirnstein's testimony a binding judicial admission, arguing that (i) an expert's testimony can constitute an admission of a party-opponent pursuant to Federal Rule of Evidence 801(d)(2)(c), *see* Fairbank's S/J Motion at 4, and (ii) an admission properly can be deemed a binding judicial admission when a party testifying at a deposition makes a "deliberate, clear, unequivocal statement . . . within that party's peculiar knowledge," *id*. at 2 (quoting *Hansen v. Ruby Constr. Co.*, 508 N.E.2d 301, 303 (Ill. App. Ct. 1987)).

"Unlike ordinary admissions, which are admissible but can be rebutted by other evidence, judicial admissions are conclusive on the party making them." *United States v. Belculfine*, 527 F.2d

---

[16] In a footnote to its reply brief in support of its own motion for summary judgment, GOPAC disputes that the *Lewis* case was overturned with respect to the point for which GOPAC cites it. *See* Third-Party Defendant GOPAC's Reply in Support of Motion for Summary Judgment ("GOPAC's S/J Reply") (Docket No. 173, *Long*; Docket No. 150, *Smith*) at 18 n.30. This is in effect a surreply for which GOPAC neglected to seek leave of court, justifying its disregard. In any event, even taking it into consideration, it is unpersuasive.

941, 944 (1st Cir. 1975). "Because of their binding consequences, judicial admissions generally arise only from deliberate voluntary waivers that expressly concede for the purposes of trial the truth of an alleged fact." *Id*. "Although there is a limited class of situations where, because of the highly formalized nature of the context in which the statement is made, a judicial admission can arise from an 'involuntary' act of a party, considerations of fairness dictate that this class of 'involuntary' admissions be narrow." *Id*. (citation omitted). *See also, e.g., Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are not evidence at all but rather have the effect of withdrawing a fact from contention. A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party.") (citations and internal quotation marks omitted).

### i. Evidentiary Admission

Pursuant to Federal Rule of Evidence 801(d)(2)(C), a statement qualifies as an admission by a party-opponent, and hence is admissible as an exception to the hearsay rule, if, *inter alia*, it "is offered against a party and is . . . a statement by a person authorized by the party to make a statement concerning the subject[.]" Fed. R. Evid. 801(d)(2)(C). "Authorization to make a statement concerning the subject matter may, of course, be established by the acts or conduct of the principal or his statements to the agent or a third party." 30B Michael H. Graham, Federal Practice and Procedure § 7022, at 243 (4th ed. 2006) (footnote omitted).

GOPAC asserts, in its additional statement of material facts, that (i) it retained Dr. Zirnstein as an expert witness so as to fully explore and better understand the allegations against it and for

technical assistance in analyzing the meat production and other records produced by the parties, in part because of the court's denial of an exception to the "Attorney's Eyes Only" provision of the operative confidentiality order with respect to GOPAC executive Angelo Fili, (ii) it always expected Dr. Zirnstein to testify impartially within the sphere of his expertise as to his independently formed opinions, (iii) Dr. Zirnstein was not subject to GOPAC's control with respect to the deposition testimony he provided, (iv) Dr. Zirnstein was not authorized at deposition to make admissions for GOPAC, and (v) GOPAC has not yet determined whether it will call Dr. Zirnstein to testify as an expert witness at trial. GOPAC's Additional SMF ¶¶ 3-7.[17]

Even taking all of these assertions at face value, I conclude that the testimony of Dr. Zirnstein on which Fairbank relies is admissible pursuant to Rule 801(d)(2)(C). It is clear that Dr. Zirnstein was authorized by GOPAC to make the statements that he made during his December 2010 deposition. While GOPAC did not expressly authorize Dr. Zirnstein to make "admissions," it expected him to testify impartially within the sphere of his expertise as to his independently formed opinions. He did exactly that. Therefore, he was authorized by GOPAC to make a statement concerning the subject matter about which he testified, including his trace-back analysis. *See, e.g., Collins v. Wayne Corp.,* 621 F.2d 777, 780-82 (5th Cir. 1980), *superseded by rule on other grounds as noted in Mathis v. Exxon Corp.,* 302 F.3d 448 (5th Cir. 2002) (district court erred in ruling defendant's expert's deposition testimony inadmissible pursuant to Federal Rule of Evidence 801(d)(2)(C) when, in giving his deposition, the expert performed the function the defendant had employed him to perform); *Bianco v. Hultsteg AB*, No. 05 C 0538, 2009 WL 347002, at *12 (N.D.

---

[17] Fairbank lodges objections to these statements, Fairbank's Reply SMF ¶¶ 3-7; however, I need not resolve them for purposes of determination of the instant motion.

Ill. Feb. 5, 2009) ("We agree that [the plaintiff's expert's] sworn testimony constitutes admissions by a party opponent within the meaning of Federal Rule of Evidence 801(d)(2), which [one of the defendants] may offer into evidence against plaintiff without running afoul of the Rule prohibiting admission of hearsay evidence."); *Dean v. Watson*, No. 93 C 1846, 1996 WL 88861, at *3-*4 (N.D. Ill. Feb. 28, 1996) (defendant's expert's testimony was admissible pursuant to Rule 801(d)(2)(C) when he was authorized by the defendant to make statements regarding the issues in the cause of action); *Yarbrough's Dirt Pit, Inc. v. Turner*, 65 S.W.3d 210, 214 (Tex. Ct. App. 2001) (holding, pursuant to Texas hearsay exception rule, that "a conclusion of an expert witness hired by an opposing party to speak on the subject matter on behalf of the party opponent is admissible against the party opponent"; observing, "Based on his designation by [plaintiff] as an expert witness and the tenor of the deposition questions submitted to him, [expert] was specifically authorized to speak on behalf of [plaintiff] about the fault of the parties.").

The fact that Dr. Zirnstein was not subject to GOPAC's control is not dispositive for these purposes, as it would have been had Fairbank invoked Rule 801(d)(2)(*D*), pertaining to the existence of an agency relationship. *See* Fed. R. Evid. 801(d)(2)(D) (a statement qualifies as an admission by a party-opponent, and hence is admissible as an exception to the hearsay rule, if, *inter alia*, it is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"); *Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 424 (Fed. Cl. 1997) ("FRE 801(d)(2)(C) and (D) are presented in the disjunctive and should not be collapsed into one rule."); *Marceau v. International Bhd. of Elec. Workers, Local 1269*, 618 F. Supp.2d 1127, 1142-43 (D. Ariz. 2009) (statements in defendants' investigators' report appeared admissible pursuant to Rule 801(d)(2)(C) when defendants

"specifically authorized Moss & Barnett to investigate the subject matter of the Report and then issue the Report. Defendants assert, without support, that the report is not a party admission because Dex hired Moss & Barnett to provide an independent, nonbinding opinion. However, that assertion, even if true, appears only to establish that the Report might not be admissible under Fed.R.Evid. 801(d)(2)(D)[.]") (citation and internal punctuation omitted).[18]

## ii. Binding Judicial Admission

Fairbank cites two cases in support of the proposition that there are circumstances in which deposition testimony appropriately is deemed a judicially binding admission: *Hansen* and *D'Amico v. Board of Med. Exam'rs*, 520 P.2d 10 (Cal. 1974). *See* Fairbank's S/J Motion at 2-3. Tellingly, neither involves expert deposition testimony. *See Hansen*, 508 N.E.2d at 304 (deposition testimony of plaintiff concerning object over which he tripped); *D'Amico*, 520 P.2d at 23 (admissions by Attorney General on behalf of defendant Board of Medical Examiners).

---

[18] GOPAC cites *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147 (3d Cir. 1995), for the proposition that expert witnesses are not agents of the parties who call them and are not authorized to make admissions. See GOPAC's S/J Opposition at 5-6. To the extent that *Kirk* collapses the requirements of Rules 801(d)(2)(C) and (D), infusing a requirement of a showing of agency into subsection (C), it is not persuasive. *See Kirk*, 61 F.3d at 163-64. Moreover, *Kirk* is distinguishable in that the expert testimony at issue there was derived from an unrelated litigation. *See id.* at 164. GOPAC also cites *Glendale* for the proposition that an expert cannot be considered authorized to make statements on behalf of a party until he or she is put forward for trial. *See* GOPAC's S/J Opposition at 6-7; *see also Glendale*, 39 Fed. Cl. at 425 ("When an expert witness is put forward as a testifying expert at the beginning of trial, the prior deposition testimony of that expert in the same case is an admission against the party that retained him. Where an expert witness is withdrawn prior to trial, however, the prior deposition testimony of that witness may not be used."). Nonetheless, the *Glendale* court did not confront a situation in which expert testimony was sought to be admitted for purposes of summary judgment. *See generally id*. Nothing in Rule 801(d)(2)(C) forbids use of admissions for that purpose, and courts have admitted such testimony in that context. *See, e.g.*, *Steuben Foods, Inc. v. Country Gourmet Foods, LLC*, 2009 WL 3191464, at *11 (W.D.N.Y. Sept. 30, 2009). No exception is made for expert testimony. *See* Fed. R. Evid. 801(d)(2)(C); *see also, e.g., Marceau*, 618 F. Supp.2d at 1142-43 (expert report admissible pursuant to Rule 801(d)(2)(C) for purposes of summary judgment); *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 459 F. Supp.2d 786, 799 (E.D. Wis. 2006) (expert report admitted pursuant to Rule 801(d)(2)(B),(C), and (D) for purposes of summary judgment). Assuming *arguendo* that a revocation of an expert's designation would preclude admission of his earlier deposition testimony pursuant to Rule 801(d)(2)(C), GOPAC has never withdrawn Dr. Zirnstein's expert designation. He was authorized at the time of the deposition to speak with respect to the subject matter presented, and he remains so. The fact that GOPAC has not decided whether to call him at trial is irrelevant.

Courts have been reluctant to treat expert opinion as a binding judicial admission. *See, e.g.,*

*Collins*, 621 F.2d at 782 (while defendant's expert's deposition testimony was admissible pursuant to

Rule 801(d)(2)(C), it "was not, of course, a binding judicial admission"); *Bianco*, 2009 WL 347002,

at *12 (declining to treat expert's opinion as a binding judicial admission when none of the

authorities cited by the proponent required or even suggested that an expert's deposition testimony

should be deemed a judicial admission).

As the Massachusetts Appeals Court explained in rebuffing an argument similar to that of

Fairbank:

> The question comes down to whether the testimony of an expert witness binds the party that called that expert. To begin with, the proposition that opinion evidence binds the party that presents it contradicts the principle that a finder of fact is not bound by expert opinion evidence, even when that opinion evidence is uncontradicted. If the trier of fact may freely reject all opinion evidence, it hardly matters who offered it. . . .

> One might posit that, if the statements of a lawyer in general bind the party the lawyer represents, then the same principle should apply to the expert that the lawyer has engaged and presumably vetted before the expert began to testify. That would, however, mischaracterize the role of the expert. Such an expert is not a party and is not an agent for the party that employed the expert. In theory, the expert is not under the control of the party that presents him and, in theory, the expert testifies impartially to assist the trier of fact about matters not in common knowledge. . . .

> Both on fundamental principles as to the nonbinding status of opinion evidence and the nonparty status of expert witnesses, the [defendants] were not bound by the testimony of [their expert witness].

*Turners Falls Ltd. P'ship v. Board of Assessors of Montague*, 767 N.E.2d 629, 634 (Mass. App. Ct.),

*review denied*, 774 N.E.2d 1099 (Mass. 2002).

I perceive no reason to deviate from this persuasive and well-reasoned authority. Dr.

Zirnstein's testimony, while admissible pursuant to Rule 801(d)(2)(C), is not binding on GOPAC.

### c. Existence of a Triable Issue of Fact

Fairbank contends that even if Dr. Zirnstein's admission is not binding and conclusive, GOPAC has failed to adduce sufficient evidence to generate a triable issue as to the probable source of the bacteria that sickened the plaintiffs. *See* Fairbank's S/J Reply at 5-6. Fairbank asserts that, in the face of the conclusion of both Dr. Zirnstein and its own experts that GOPAC was the probable source, GOPAC musters only the evidence of three other experts that it is not possible to determine the probable source. *See id.* at 1, 6. It argues that, as a matter of law, this is insufficient to controvert the affirmative testimony of its experts and Dr. Zirnstein. *See id.*; *Taylor v. Dallas Cnty. Hosp. Dist.*, 959 F. Supp. 373, 377 (N.D. Tex. 1996) ("To defeat a summary judgment motion that relies on expert affidavits, the nonmovant must submit controverting expert evidence.").

Fairbank bears the burden of demonstrating that GOPAC was the probable source of the bacteria in question. *See, e.g.*, Fairbank's S/J Reply at 1-2. A reasonable trier of fact could credit GOPAC's experts' evidence that it is not possible on the available record to determine the probable source of the bacteria and, hence, conclude that Fairbank failed to meet its burden of proof. Hence, summary judgment in Fairbank's favor is unwarranted.[19]

---

[19] Fairbank cites *Golf Tech, LLC v. Edens Techs., LLC*, 592 F. Supp.2d 167, 174 (D. Me. 2009), for the propositions that expert speculation is insufficient to defeat summary judgment and that evidence that does not directly confront an expert's conclusion fails to create a genuine issue of material fact, and *Stone v. Riffe*, No. 96CA2408, 1997 WL 88967, at *8 (Ohio Ct. App. Feb. 25, 1997), for the proposition that expert testimony regarding a causative event must be expressed in terms of probability regardless of whether the proponent of the evidence bears the burden of persuasion on the issue and, thus, an expert for the defense is precluded from engaging in mere speculation or conjecture concerning possible causes, just as is an expert for the plaintiff. *See* Fairbank's S/J Reply at 6 & n.2. Drs. Acheson, Allen, and Samadpour do not speculate as to causation. Rather, they state that it is not possible on the existing evidence to determine which of Fairbank's meat suppliers was the probable source of the bacteria that sickened the plaintiffs. Moreover, their opinion directly confronts the conclusions of Fairbank's experts and Dr. Zirnstein that such a determination is possible and that GOPAC was the probable source.

## C. GOPAC's Summary Judgment Motion

### 1. Factual Background

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Fairbank as nonmovant, reveal the following relevant facts.[20]

On October 17, 1994, the USDA announced in an interpretive rule that *E. coli* O157:H7 would be treated as an adulterant under the Federal Meat Inspection Act. Third-Party Defendant GOPAC's Statement of Material Facts ("GOPAC's SMF") (Docket No. 117, *Long*; Docket No. 95, *Smith*) ¶ 6; Fairbank's Opposing Statement of Material Facts ("Fairbank's Opposing SMF") (Docket No. 146, *Long*; Docket No. 123, *Smith*) ¶ 6.

On September 19, 2009, plaintiff Margaret Long purchased ground beef at Shaw's Supermarket in Augusta, Maine. *Id*. ¶ 7 (*Long*). On September 23, 2009, plaintiff Alice Smith purchased ground beef at Shaw's Supermarket in Portland, Maine. *Id*. (*Smith*). The ground beef purchased by both plaintiffs had been processed and sold by Fairbank. *Id*. ¶ 8. That ground beef was contaminated with *E. coli* O157:H7 at the time it left the control of Fairbank at its plant in Ashville, New York. *Id*. ¶ 9.[21] Long and Smith consumed that ground beef. *Id*. ¶ 10. Stool cultures taken from Long on October 5, 2009, and Smith on November 17, 2009, were positive for *E. coli* O157:H7. *Id*. ¶ 11.

On October 31, 2009, Fairbank voluntarily recalled 545,699 pounds of ground beef products

---

[20] To the extent that I have incorporated one of the party's qualifications into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.

[21] Fairbank qualifies this statement, asserting that the ground beef purchased by the plaintiffs was processed using raw beef trim supplied by GOPAC, and that, as conceded by GOPAC's traceback expert, Dr. Zirnstein, GOPAC was the probable source of the bacteria. Fairbank's Opposing SMF ¶ 9; Fairbank's SMF ¶¶ 10-14.

that had been processed at its Ashville, New York, facility on September 14, 15, and 16, 2009. *Id.*

¶ 12. The ground beef purchased by Long on September 19, 2009, and Smith on September 23,

2009, was among the ground beef recalled. *Id.* ¶ 13. Fairbank issued the voluntary recall on October

31, 2009, due to the suggested association with the cluster of *E. coli* O157:H7 infections in New

England known generally, and hereinafter, as "the Northeast Outbreak." *Id.* ¶ 14. Long's and

Smith's *E. coli* O157:H7 infections in October 2009 are the subject of the instant actions and

resulted from their above-referenced consumption of the ground beef that had been processed and

sold by Fairbank. *Id.* ¶ 15.

On February 19, 2009, Fairbank sent contract documents to GOPAC including its Raw

Material Specifications, and requested that GOPAC return a signed acknowledgement of those

contract specifications. Fairbank'[s] Supplemental Statement of Material Facts ("Fairbank's

Additional SMF"), commencing on page 8 of Fairbank's Opposing SMF, ¶ 9; Reply to Fairbanks'

Supplemental Statement of Material Facts ("GOPAC's Reply SMF") (Docket No. 175, *Long*; Docket

No. 152, *Smith*) ¶ 9. On March 5, 2009, Michele Hatch, then GOPAC's Quality Assurance Manager,

executed the contract and the Product Guarantee ("Fairbank Guarantee") and returned them to

Fairbank. *Id.* ¶ 10.[22] In the Fairbank Guarantee, GOPAC guaranteed, in relevant part, that it would:

> . . . indemnify and hold harmless American Foodservice Corporation and American
> Fresh Foods, and its[] affiliates [Fairbank], their Officers, Directors, employees and
> agents (herein referred to as "Buyer") harmless from all claims, damages, causes of
> actions, suits, proceedings, judgments, charges, losses, costs, liabilities and expenses
> (including attorneys' fees) arising from any products (raw materials) as delivered to

---

[22] GOPAC's objection on the bases that the page purporting to bear Hatch's signature has a facsimile strip designating it as page 15 of 19 pages, the other pages produced by Fairbank lack a facsimile strip, and no foundation has been laid as to the remaining pages of the document, GOPAC's Reply SMF ¶ 10, is overruled. Fairbank employee Bob Chudy lays a proper foundation that the page in question is what it purports to be. *See* Affidavit of Bob Chudy ("Chudy Aff.") (Docket No. 146-19, *Long*; Docket No. 123-19, *Smith*) ¶ 4 & Exh. B thereto (Docket No. 146-21, *Long*; Docket No. 123-21, *Smith*).

Buyer by [GOPAC], that do not comply with the provisions of the Buyer's Raw
Material Specifications or that are caused by the negligence or intentional misconduct
of [GOPAC], its[] Agents and employees.

Third-Party Complaint (*Long*) ¶ 12; GOPAC's S/J Motion at 1-2; Fairbank's Response Brief to

GOPAC's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment on

Indemnification ("Fairbank's S/J Opposition") (Docket No. 145, *Long*; Docket No. 122, *Smith*) at 4-

5.[23]

On May 6, 2009, at 9:55 a.m., Debbie Chen ( Heacock) of Fairbank wrote to GOPAC

requesting a documented letter of certification that supported all of the GOPAC house grade select

trimmings, which is one of the items called for in the contract documents. Fairbank's Additional

SMF ¶ 11; GOPAC's Reply SMF ¶ 11.[24] GOPAC's response to the May 6, 2009, email from

Heacock was an email, with attachment, sent from Staci McKee on behalf of Michele Hatch at 12:01

p.m. on May 6, 2009. *Id.* ¶ 12.

The May 6, 2009, email response from McKee enclosed a highlighted copy of GOPAC's

January 26, 2009, general letter of certification. *Id.* ¶ 13. Later that same day, GOPAC Sales

Representative Dean Johnson sent a formal letter of certification/guarantee specifically adopting the

language required by the Domestic Beef Raw Material Specifications. *Id.*[25] This letter is required

from suppliers to warrant that their raw materials will be derived from grain-fed (as opposed to

grass-fed) cattle. *Id.*

---

[23] I quote from the Fairbank Guarantee as set forth in Fairbank's third-party complaint and quoted by both parties in their
briefs rather than relying upon Fairbank's statements of material fact characterizing the Fairbank Guarantee, Fairbank's
Additional SMF ¶¶ 23-24, to which GOPAC objects, GOPAC's Reply SMF ¶¶ 23-24.
[24] As GOPAC points out, GOPAC's Reply SMF ¶ 11, Fairbank mistakenly references contract documents cited in
paragraphs 2 and 3 of its statement of additional facts, Fairbank's Additional SMF ¶ 11. It clearly meant to reference the
contract documents described in paragraphs 10 and 11.
[25] My recitation includes GOPAC's qualification.

On June 3, 2009, Kathleen Krantz, GOPAC's Vice President, Technical Resources, signed a document captioned "General and Continuing Pure Food/Hold Harmless Guarantee" ("GOPAC Guarantee"). GOPAC's SMF ¶ 3; Fairbank's Opposing SMF ¶ 3. On June 3, 2009, McKee transmitted the GOPAC Guarantee to Heacock of American Foodservice via email. *Id.* ¶ 5. The GOPAC Guarantee provided, in relevant part:

> 2. INDEMNIFICATION: Each party to this agreement hereby agrees to indemnify the other for any losses or damages occasioned or caused by the breach of a guaranty set forth in this agreement or the negligence or other wrongful conduct of the party making the indemnification. This indemnification will be in proportion to the share of the indemnifying parties' negligence or wrongful conduct. Each party to this agreement remains liable for any loss or damage occasioned solely by its own negligence or wrongful conduct.
> For purposes of this agreement, the term "losses or damages" means damages, liabilities, obligations, deficiencies, claims, actions, charges, demands, judgments, interest, losses, diminution in value or costs or expenses of whatever kind of [sic] nature, except that it shall not include nor extend to punitive or exemplary damages or attorneys' fees.
>
> ***
>
> 5. This agreement shall be governed by, and construed in accordance with, the laws of the State of Nebraska.
>
> ***
>
> 7. All previous Guarantee[s] given by [GOPAC] to [Fairbank] are hereby revoked.

GOPAC's SMF ¶ 2; GOPAC Guarantee, Exh. B to Affidavit of Angelo Fili ("First Fili Aff.") (Docket No. 117-2, *Long*; Docket No. 95-2, *Smith*), Exh. 2 to GOPAC's SMF.[26]

The June 3, 2009, email from McKee was not sent in response to the May 6, 2009, email

---

[26] GOPAC neglects to quote this provision in its statement of material facts, although it cites to and supplies the underlying document. GOPAC's SMF ¶ 2. Nonetheless, it quotes this language in its brief. GOPAC's S/J Motion at 14. Fairbank does not object to consideration of the quoted language or dispute its accuracy. *See generally* Fairbank's S/J Opposition. Thus, I have taken it into account.

from Heacock. Fairbank's Additional SMF ¶ 14; Affidavit of Debra Chen ("Chen Aff.") (Docket No. 146-24, *Long*; Docket No. 123-24, *Smith*) ¶¶ 8-10.[27] The June 3, 2009, email from McKee was never solicited by Fairbank nor discussed with Fairbank. Fairbank's Additional SMF ¶ 15; GOPAC's Reply SMF ¶ 15. The GOPAC Guarantee attached to the June 3, 2009, email from McKee was never solicited by Fairbank. *Id.* ¶ 16. Fairbank never executed or relied on the GOPAC Guarantee. Fairbank's Additional SMF ¶ 17; Chen Aff. ¶¶ 8-11.[28]

GOPAC provided Fairbank with a Certificate of Analysis stating that each combo that it shipped Fairbank in September 2009 had tested negative for *E. coli* O157:H7. Fairbank's Additional SMF ¶ 19; GOPAC's Reply SMF ¶ 19.[29] Fairbank relied upon its contract with GOPAC as well as the Certificate of Analysis from GOPAC as assurance that the raw material GOPAC delivered had been tested and was free from bacterial contamination. Fairbank's Additional SMF ¶ 20; Chudy Aff. ¶ 19.[30] Fairbank had no knowledge that the raw material it received from GOPAC in September 2009 was contaminated with *E. coli* O157:H7. Fairbank's Additional SMF ¶ 21; Chudy Aff. ¶ 20.[31]

Fairbank requires all raw material suppliers to sample and test all products for *E. coli* O157:H7 before shipment. Fairbank's Additional SMF ¶ 1; GOPAC's Reply SMF ¶ 1. This

---

[27] GOPAC denies this, GOPAC's Reply SMF ¶ 14, but I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.
[28] GOPAC denies this statement in part, but its denial is in the nature of a legal argument: It denies that execution of the GOPAC Guarantee was necessary and argues that Fairbank "relied" on the Guarantee by continuing to accept shipments of raw material from GOPAC after receiving it. GOPAC's Reply SMF ¶ 17.
[29] I omit the remainder of this statement, which is neither admitted nor supported by the citation given.
[30] GOPAC purports to deny this statement to the extent that (i) it asserts that the Fairbank Guarantee, rather than the GOPAC Guarantee, controlled the parties' rights and responsibilities in September 2009 and (ii) the phrase "relied upon" implies that Fairbank had no independent duties of care. GOPAC's Reply SMF ¶ 20. This denial, however, is in the nature of a legal argument.
[31] GOPAC denies that the raw material that it supplied Fairbank was contaminated with *E. coli* O157:H7, GOPAC's Reply SMF ¶ 21, but I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

requirement is part of Fairbank's HACCP [Hazard Analysis Critical Control Point] plan. *Id.*[32] GOPAC was required under federal law to properly test its raw trim for *E. coli* O157:H7 prior to releasing that product into interstate commerce. Fairbank's Additional SMF ¶ 2; Videotaped Deposition of Kathleen Krantz (Docket No. 146-4, *Long*; Docket No. 123-4, *Smith*), Exh. 3 to Affidavit of Ralph A. Weber ("Weber Aff./GOPAC S/J Motion") (Docket No. 146-1, *Long*; Docket No. 123-1, *Smith*), at 196.[33] It is more difficult for processors like Fairbank to effectively "retest" incoming trim than it is for the supplier to test the same trim as it leaves its facility. Fairbank's Additional SMF ¶ 3; Oral Deposition of Timothy Biela ("Biela Dep./Fairbank") (Docket No. 146-2, *Long*; Docket No. 123-2, *Smith*), Exh. 1 to Weber Aff./GOPAC S/J Motion, at 176-77.[34]

GOPAC has told its customers that it will not accept the customers' lab results and, if they obtain positive test results, it will not accept return of the product. Fairbank's Additional SMF ¶ 4; Email exchange of October 6, 2010, between Bruce Simon of Omaha Steaks and Henry Davis of GOPAC ("Davis Email") (Docket No. 146-5, *Long*; Docket No. 123-5, *Smith*), Exh. 4 to Weber Aff./GOPAC S/J Motion.[35] In response to the email of GOPAC's President Davis, Simon responded: "That's great, then we shouldn't have to recheck it if you already have." Fairbank's

---

[32] GOPAC denies paragraph 1 in part on the basis that, in September 2009, Fairbank did not apply any of its own specifications to BPI, one of the suppliers of raw materials for the product involved in the outbreak. GOPAC's Reply SMF ¶ 1. However, I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[33] GOPAC denies this, GOPAC's Reply SMF ¶ 2, but I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[34] I have set forth so much of this statement as is supported by the citation given. GOPAC's objection that the statement should be stricken because it sets forth an opinion rather than an appropriate statement of fact, GOPAC's Reply SMF ¶ 3, is overruled. GOPAC alternatively denies the statement in part, *id*., but I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[35] GOPAC's objection to this statement on the grounds that the cited material is inadmissible and irrelevant, GOPAC's Reply SMF ¶ 4, is overruled. GOPAC fails to explain on what basis the cited material is inadmissible. The material is relevant to Fairbank's opposition to GOPAC's motion. GOPAC alternatively admits and qualifies the statement, denying it to the extent that the email suggests that it discouraged its customers from conducting their own testing of raw materials received from suppliers and asserting that it cannot accept returns of product that tested positive from customers because (*continued on next page*)

Additional SMF ¶ 5; Davis Email.[36]

Fairbank pays for suppliers, including GOPAC, to conduct the *E. coli* testing that Fairbank requires of them. Fairbank's Additional SMF ¶ 7; GOPAC's Reply SMF ¶ 7. Fairbank requires its suppliers to convey a Certificate of Analysis indicating that testing for *E. coli* O157:H7 was performed and was negative. *Id*. ¶ 8.[37]

On September 11, 2009, the day it produced raw trim to ship to Fairbank, GOPAC had five positive results in its *E. coli* O157:H7 testing. Fairbank's Additional SMF ¶ 25; GOPAC's Reply SMF ¶ 25.[38] The product shipped by GOPAC to Fairbank was produced on September 11, 2009, within minutes of multiple other lots that tested positive for *E. coli* O157:H7. *Id*. ¶ 26. This is confirmed by comparing the timing of GOPAC's production of the lots of GOPAC trim that tested positive on September 11, 2009, for *E. coli* O157:H7 to the timing of the trim GOPAC shipped to Fairbank. *Id*.[39]

Fairbank identified the following suppliers that contributed materials to the Fairbank products

---

it is not a cooker or renderer. *Id*.; Affidavit of Angelo Fili ("Second Fili Aff.") (Docket No. 175-2, *Long*; Docket No. 152-2, *Smith*) ¶ 5.

[36] GOPAC's objection to this statement on the grounds that the cited material is inadmissible and irrelevant and the quoted language is hearsay and is merely a comment of a nonparty rather than a fact, GOPAC's Reply SMF ¶ 5, is overruled. The statement is not hearsay because it is not offered in evidence to prove the truth of the matter asserted. While it is a comment by a nonparty, it is a fact relevant to Fairbank's opposition to GOPAC's motion. GOPAC alternatively admits and qualifies the statement, denying it to the extent that the email suggests that it discouraged its customers from conducting their own testing of raw materials received from suppliers. *Id*.; Second Fili Aff. ¶ 5.

[37] My recitation incorporates GOPAC's qualification.

[38] GOPAC's objection to this statement on the basis that it is unrelated to the subject matter of GOPAC's motion, GOPAC's Reply SMF ¶ 25, is overruled. The statement is relevant to Fairbank's response to GOPAC's motion. GOPAC's further assertions with regard to this statement are unsupported by a record citation, *id*., and, hence, I disregard them.

[39] GOPAC's objection to this statement on the basis that it is unrelated to the subject matter of GOPAC's motion, GOPAC's Reply SMF ¶ 26, is overruled. The statement is relevant to Fairbank's response to GOPAC's motion. GOPAC alternatively qualifies this statement, asserting that most of the products that tested positive on September 11, 2009, were related to a different product produced from a different part of an animal at a different location within the fabrication facility than the products produced and delivered to Fairbank. *Id*.; Second Fili Aff. ¶ 10. GOPAC adds that the single product that tested positive and was fabricated on the same line as the products shipped to Fairbank was (*continued on next page*)

implicated in the outbreak: XL Four Star, Long Prairie Packing, BPI, Martin's Abbatoir, and two foreign companies, PUL and ECO. GOPAC's SMF ¶ 37; Fairbank's Opposing SMF ¶ 37.[40]

Whereas five of GOPAC's 58 raw beef lots tested positive for *E. coli* O157:H7 on September 11, 2009, Fairbank's remaining suppliers collectively performed more than 1,000 tests of their own raw materials on the relevant production days, and all of those tests were negative. Fairbank's Additional SMF ¶ 31; Videotaped Deposition of Thomas J. Hoffman (Docket No. 146-15, *Long*; Docket No. 123-15, *Smith*), Exh. 14 to Weber Aff./GOPAC S/J Motion, at 111-12.[41]

In September 2009, Fairbank did not sample or test incoming raw materials that it received from suppliers to its plant in Ashville, New York, for *E. coli* O157:H7. GOPAC's SMF ¶ 16; Fairbank's Opposing SMF ¶ 16.[42] There is no federal requirement that ground beef processors like Fairbank test their finished products, and GOPAC can point to none. Fairbank's Additional SMF ¶ 32; GOPAC's Reply SMF ¶ 32.

In September 2009, Fairbank used a system of testing its finished product (ground beef) with

---

produced several hundreds of animals after fabrication of the Fairbank product. *Id.*

[40] GOPAC asserts that Fairbank is unable to trace the source of the *E. coli* O157:H7 as a result of various production practices at its facility, including cross-contamination issues arising from its failure to sanitize tools used to access raw materials from combo bins, and assertedly inaccurate production recordkeeping and incomplete recordkeeping relating to the retail sale of its products. GOPAC's SMF ¶¶ 38-43, 46-47. Fairbank denies this, asserting, *inter alia*, that its experts and one of GOPAC's experts, Dr. Zirnstein, identified GOPAC as the most probable source of the *E. coli* O157:H7 contamination. Fairbank's Opposing SMF ¶¶ 38-43, 46-47; Fairbank's SMF ¶¶ 10-14. I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[41] GOPAC's objection to this statement on the grounds that the cited material is inadmissible, irrelevant, contains hearsay, and is merely a comment or an opinion of a nonparty to the case and is not based on his personal knowledge, GOPAC's Reply SMF ¶ 31, is overruled. Sworn deposition testimony is admissible for purposes of summary judgment, even if it is not admissible at trial. *See, e.g., Burbank v. Davis*, 227 F. Supp.2d 176, 179 (D. Me. 2002). Hoffman is an expert witness, and an expert "is permitted to base his opinion on hearsay evidence and need not have personal knowledge of the facts underlying his opinion." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 706 n.7 (9th Cir. 2010). The testimony is relevant. GOPAC alternatively denies the statement, GOPAC's Reply SMF ¶ 31; however, I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[42] Fairbank qualifies this statement, asserting that although it did not "retest" its raw materials for E. coli O157:H7 when they arrived at its facility, it contracted with GOPAC to perform this testing, and GOPAC was required by federal law to do so. Fairbank's Opposing SMF ¶ 16; Fairbank's Additional SMF ¶¶ 1-2.

the intention of detecting even a low level of contamination of *E. coli* O157:H7. GOPAC's SMF ¶ 17; Fairbank's Opposing SMF ¶ 17. Fairbank's finished product testing system failed to detect the *E. coli* O157:H7 contamination when product left its facility to enter commerce on the occasion of the above-referenced outbreak and recall, including the ground beef purchased and consumed by Long and Smith. *Id.* ¶ 18.

In September 2009, Fairbank's program for testing of its finished product (ground beef) used a method known as the "lateral flow test," a screening method. *Id.* ¶ 19.[43] In September 2009, Fairbank incubated the samples taken in its finished product testing for eight hours. *Id.* ¶ 20.[44] In 2009, if finished product (ground beef) tested negative for *E. coli* O157:H7 using the "lateral flow test," Fairbank released such product into commerce. *Id.* ¶ 21. In September 2009, Fairbank used a second method known as "PCR testing," PCR/DNA assay, or "BAX Classic" testing only in the approximately .025 percent of cases in which it obtained a "reactive" (preliminary positive) result for *E. coli* O157:H7 using the initial screening test. *Id.* ¶ 22.[45] Use of PCR/DNA assay on Fairbank's finished product as the initial screening method in September 2009 would have enhanced Fairbank's ability to produce safe ground beef products. *Id.* ¶ 25.[46] PCR/DNA assay technology was available in September 2009. GOPAC's SMF ¶ 26; Biela Dep./GOPAC at 134-36.[47]

Four weeks after issuing a NOIE to Fairbank in December 2009, the USDA issued a NOIE to

---

[43] My recitation incorporates Fairbank's qualification.

[44] My recitation incorporates Fairbank's qualification.

[45] My recitation incorporates Fairbank's qualification. I omit paragraphs 23 and 24, GOPAC's SMF ¶¶ 23-24, which, as Fairbank points out, Fairbank's Opposing SMF ¶¶ 23-24, are not supported by the cited testimony of Biela.

[46] Fairbank qualifies this statement, asserting that the first steps in detecting *E. coli* O157:H7 contamination must be taken by suppliers like GOPAC pursuant to federal law and the Fairbank Guarantee and that Biela disputed GOPAC's counsel's characterization that the lateral flow test was "less reliable" than some other methods. Fairbank's Opposing SMF ¶ 25; Fairbank's Additional SMF ¶¶ 1-2, 7-9; Oral Deposition of Timothy Biela ("Biela Dep./GOPAC) (Docket No. 117-4, *Long*; Docket No. 95-4, *Smith*) at 147-48.

[47] I omit the balance of paragraph 26, GOPAC's SMF ¶ 26, which Fairbank denies, Fairbank's Opposing SMF ¶ 26.

GOPAC. Fairbank's Additional SMF ¶ 33; GOPAC's Reply SMF ¶ 33.[48] The notice stated that

deficiencies at GOPAC left the agency without assurance that GOPAC's system was adequate to

produce product that was not adulterated or injurious to health. Fairbank's Additional SMF ¶ 35;

NOIE to GOPAC dated January 21, 2010 ("GOPAC NOIE") (Docket No. 146-16, *Long*; Docket No.

123-16, *Smith*), Exh. 15 to Weber Aff./GOPAC S/J Motion, at [3].[49]

In its NOIE to Fairbank, the USDA queried whether testing of a portion of an hourly sample

was sufficient to detect low levels of *E. coli* in the whole hourly sample. GOPAC's SMF ¶ 31;

Fairbank's Opposing SMF ¶ 31.[50] Fairbank does not have any lab work from its plant suggesting

that, on the production days of September 14, September 15, or September 16, it recorded any

positive results for the *E. coli* O157:H7 on its finished product testing. *Id.* ¶ 45.

---

[48] GOPAC's objections on the grounds that the statement is irrelevant and the cited material is inadmissible, GOPAC's Reply SMF ¶ 33, are overruled. GOPAC fails to explain how the cited NOIE is inadmissible, and the statement is relevant to Fairbank's opposition to GOPAC's motion. I omit a portion of the underlying statement that is neither admitted nor supported by the citation given.

[49] GOPAC's objections on the grounds that the statement is irrelevant and the cited NOIE, a draft NOIE, is inadmissible, GOPAC's Reply SMF ¶ 35, are overruled. The statement is relevant to Fairbank's opposition to GOPAC's motion. GOPAC offers no authority for the proposition that a draft NOIE is inadmissible. GOPAC alternatively denies the statement, *id.*, but I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[50] My recitation includes Fairbank's qualification. Relying in whole or in part on a citation to the NOIE issued to Fairbank, *see* NOIE to Fairbank dated December 21, 2009 ("Fairbank NOIE"), Exh. 9 to Deposition of Donald Butler (Docket No. 117-6, *Long*; Docket No. 95-6, *Smith*), Exh. 5(a) to GOPAC's SMF, GOPAC further asserts that, at relevant times, (i) Fairbank's Raw Ground HACCP system was inadequate pursuant to 9 C.F.R. Part 417.6(d), GOPAC's SMF ¶ 27, (ii) the FSIS was unable to determine that products produced under the HACCP system or within Fairbank's facility were not adulterated as defined in 21 U.S.C. § 601(m)(4) of the Federal Meat Inspection Act, *id.* ¶ 28, (iii) Fairbank's sampling and testing specification was inadequate to support the decision in its HACCP at receiving that *E. coli* O157:H7 was not a significant food safety hazard, *id.* ¶ 29, (iv) because of Fairbank's failure to test incoming raw materials for *E. coli* O157:H7, it could not support the decision contained in its HACCP that *E. coli* O157:H7 was not reasonably likely to occur in raw materials being received at its plant, in violation of federal regulations, *id.* ¶ 30, (v) Fairbank failed to demonstrate that its raw material specifications were met and, where those specifications could not be verified, could not support the decisions in its HACCP, *id.* ¶ 32, and (vi) Fairbank's HACCP system was inadequately designed to ensure the production of a safe product for reasons including its commingling of meat raw materials and products on common lines and equipment, its use of "work in progress" and rework, its failure to monitor its suppliers adequately, and its failure to follow its Imported Beef Raw Material Specifications, *id.* ¶ 36. While Fairbank does not deny the issuance to it of the NOIE, it denies that paragraph 32 accurately describes the findings of the NOIE and denies the truth of the substance of each of these assertions or that its employee Donald Butler "adopted" them, as GOPAC asserts. Fairbank's Opposing SMF ¶¶ 27-30, 32, 36. I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

In response to questions regarding the Fairbank NOIE, Donald Butler testified that Fairbank had an "adequate and robust" HACCP plan. Fairbank's Additional SMF ¶ 36; Continued Videotaped Deposition of Donald L. Butler ("Butler Dep./Fairbank") (Docket No. 146-17, *Long*; Docket No. 123-17, *Smith*), Exh. 16 to Weber Aff./GOPAC S/J Motion, at 255-56. In addition, Dr. Marsden, Fairbank's FSIS meat industry expert, testified at his deposition that the USDA did not lay the groundwork or make a case supporting its generalized statement that Fairbank's HACCP plan was inadequate. Fairbank's Additional SMF ¶ 36; Videotaped Deposition of James L. Marsden, Ph.D. (Docket No. 146-18, *Long*; Docket No. 123-18, *Smith*), Exh. 17 to Weber Aff./GOPAC S/J Motion, at 164-65.[51] Butler testified that the trace-back analysis performed showed that GOPAC was the most likely source. Fairbank's Additional SMF ¶ 37; Butler Dep./Fairbank at 256-58.[52]

Fairbank has designated no expert opinion that its testing/sampling program for incoming raw materials at its Ashville, New York plant in September 2009 met applicable standard of care. GOPAC's SMF ¶ 33; Expert Witness Disclosures.[53] Fairbank has designated no expert witness opinion that its testing program for finished product (ground beef) produced by its Ashville, New

---

[51] GOPAC's objection to paragraph 36 on the ground that it describes opinions rather than facts, GOPAC's Reply SMF ¶ 36, is overruled. That these individuals held these opinions is a "fact" for purposes of the instant motion. GOPAC alternatively denies paragraph 36, *id*.; however, I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[52] I sustain in part GOPAC's objection to this statement, GOPAC's Reply SMF ¶ 37, omitting Fairbank's assertion that Butler also testified that the USDA reached this conclusion as well, Fairbank's Additional SMF ¶ 37, on the basis that it constitutes inadmissible hearsay. To the extent that GOPAC objects that the balance of the statement is inadmissible and irrelevant, GOPAC's Reply SMF ¶ 37, its objection is overruled. GOPAC alternatively denies that trace-back analysis shows that it was the most likely source, *id*., but I view the cognizable evidence in the light most favorable to Fairbank, as nonmovant.

[53] Fairbank purports to deny this paragraph and paragraph 34, Fairbank's Opposing SMF ¶¶ 33-34, but its denial is in the nature of a qualification: that these statements falsely imply that processors like Fairbank are required to conduct testing/sampling of incoming raw materials and of finished product when there is no such federal requirement, and slaughter facilities like GOPAC, not processing facilities like Fairbank, are required under federal law to conduct raw material testing, *id*.; Fairbank's Additional SMF ¶¶ 2,6.

York, plant in September 2009 met the applicable standard of care. GOPAC's SMF ¶ 34; Expert Witness Disclosures. GOPAC has designated expert witness opinion that Fairbank failed to meet the standard of care and failed to do all that it could have to prevent the outbreak of *E. coli* O157:H7 illness. GOPAC's SMF ¶ 35; Expert Report of Mansour Samadpour, Ph.D. (Docket Nos. 117-12 to 117-14, *Long*; Docket Nos. 95-12 to 95-14, *Smith*), attached to Third Party Defendant Greater Omaha Packing Company's Rule 26(a)(2) Expert Witness Disclosures ("GOPAC's Expert Witness Disclosures"), Exhs. 7-7(d) to GOPAC's SMF, at 22; Expert Report of David W.K. Acheson, M.D., F.R.C.P. (Docket Nos. 117-15 & 117-16, *Long*; Docket Nos. 95-15 & 95-16, *Smith*), attached to GOPAC's Expert Witness Disclosures, at 9.[54]

## 2. Discussion

GOPAC seeks summary judgment as to all of Fairbank's claims against it on the basis that Fairbank cannot prove that GOPAC is the source of the *E. coli* O157:H7 that contaminated the beef consumed by the plaintiffs. *See* GOPAC's S/J Motion at 22-27. Alternatively, it seeks summary judgment in whole or in part on various grounds with respect to Fairbank's contractual and common-law claims for indemnification. *See id*. at 1-22.

With respect to contractual indemnification, GOPAC argues that (i) the contract on which Fairbank relies, the Fairbank Guarantee, was superseded or revoked by the GOPAC Guarantee, *see id*. at 13-17, (ii) even if the Fairbank Guarantee applies, it does not clearly and unequivocally reflect the parties' intention that GOPAC indemnify Fairbank for losses caused by Fairbank's own

---

[54] Fairbank purports to deny this paragraph, Fairbank's Opposing SMF ¶ 35, but its denial is in the nature of a qualification: that GOPAC's expert has conceded that the most probable source of the *E. coli* O157:H7 contamination was GOPAC's raw materials, *id*.; Fairbank's SMF ¶¶ 10-14.

negligence, *see id.* at 1-10, and (iii) even if the Fairbank Guarantee applies, it does not entitle Fairbank to indemnification from GOPAC for damages for which Fairbank is determined to be strictly liable, *see id.* at 10-13.[55]

With respect to common-law indemnification, GOPAC argues that (i) common-law indemnification is not available if an express contract for indemnification exists and, in any event, (ii) Fairbank was an "active" rather than "passive" tortfeasor and, hence, is not entitled to common-law indemnification. *See id.* at 17-20.

For the reasons that follow, I conclude that GOPAC fails to demonstrate its entitlement to summary judgment on any of those bases.

### a.  Whether There Is Triable Issue on Source of Contamination

Just as, for purposes of Fairbank's motion for summary judgment, GOPAC adduced sufficient evidence to generate a triable issue with respect to whether it is the probable source of the *E. coli* O157:H7 bacteria that sickened the plaintiffs, *see supra*, Fairbank does the same in resisting GOPAC's motion for summary judgment, *see*, *e.g.*, Fairbank's Opposing SMF ¶¶ 27-30, 32, 36. GOPAC accordingly fails to demonstrate its entitlement to summary judgment on this basis as to all of Fairbank's claims against it.

### b.  Whether the GOPAC Guarantee Controls

As GOPAC observes, *see* GOPAC's S/J Reply at 1-2, the question of whether the GOPAC Guarantee constitutes the parties' operative indemnification agreement is governed by Article 2 of

---

[55] GOPAC also makes a standalone argument that Fairbank's intervening negligence supersedes any negligence of GOPAC such that GOPAC's negligence, if any, was not the proximate cause of the plaintiffs' injuries. *See* GOPAC's S/J Motion at 20-22.  Fairbank construes this as bearing on the question of whether Fairbank is entitled to contractual indemnification under the Fairbank Guarantee, *see* Fairbank's S/J Opposition at 23-25, and GOPAC does not indicate in its reply brief that this is a misconstruction, *see generally* GOPAC's S/J Reply.

the Uniform Commercial Code ("UCC"), *see* Neb. Rev. Stat. U.C.C. § 2-102 (Article 2 of UCC "applies to transactions in goods").[56]

GOPAC argues that its June 3, 2009, email to Heacock with the attached GOPAC Guarantee was an offer that Fairbank accepted by (i) not repudiating it and (ii) subsequently performing under it. *See* GOPAC's S/J Reply at 3. GOPAC cites (i) UCC § 2-201 for the proposition that the signature of the party seeking enforcement, Fairbank, was not required for formation of a binding contract and (ii) UCC §§ 2-204(1) and 2-206 for the proposition that Fairbank could and did accept the offer of the GOPAC Guarantee by continuing to place orders after receiving it. *See id.* at 3-5. I am unpersuaded.[57]

Section 2-201(2)(a) provides that the statute of frauds requirement set forth in section 2-201(1) is satisfied "[b]etween merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents . . . unless written notice of objection to its contents is given within ten days after it is received." Neb. Rev. Stat. U.C.C. § 2-201(2)(a). For several reasons, this provision does not help

---

[56] GOPAC asserts that the court need not conduct choice of law analysis inasmuch as applicable UCC provisions are materially indistinguishable in the four states whose law might possibly apply: Maine, Nebraska, Pennsylvania, and New York. *See* GOPAC's S/J Reply at 2 & n.2. For ease of reference, I cite Nebraska's version of the UCC.

[57] GOPAC initially argued that its June 3, 2009, email attaching the GOPAC Guarantee constituted an "acceptance" of an "offer" from Fairbank made by way of Heacock's May 6, 2009, email to GOPAC requesting information contained in GOPAC's Letter of Guarantee, specifically, Heacock's request for a documented letter of certification, updated annually, supporting all house grade select trimmings, *see* GOPAC's S/J Motion at 14-16, contending only in the alternative that its June 3, 2009, email constituted an "offer" that Fairbank accepted, *see id.* at 16-17. In conjunction with its opposition, *see* Fairbank's S/J Opposition at 6-9, Fairbank adduced undisputed evidence that on May 6, 2009, the same day as Heacock's email, two GOPAC employees sent Heacock materials responsive to her email request, *see* Fairbank's Additional SMF ¶¶ 11-13; GOPAC's Reply SMF ¶¶ 11-13. Seemingly implicitly acknowledging that this evidence debunked the notion that GOPAC's June 3, 2009, email could have constituted an "acceptance" of any "offer" made in Heacock's May 6, 2009, email, GOPAC did not renew that argument in its reply brief, pressing only its alternative contention that its June 3, 2009, email was an "offer." *See* GOPAC's S/J Reply at 1-5. To the extent that GOPAC means to continue to press the argument that the June 3, 2009, email was an "acceptance," I reject it as contrary to the undisputed facts.

38

GOPAC. First, the document that McKee emailed to Fairbank's Heacock on June 3, 2009, was not "a writing in confirmation of the contract[.]" *Id.* It was unsolicited and was not the product of any discussion or agreement between the parties. Second, Fairbank did not have "reason to know its contents[,]" *id.*, at the time of its receipt. Third, this provision pertains only to whether a purported contract satisfies the statute of frauds: it does not address whether a valid oral contract was in fact made. *See id.* cmt. 3 ("Between merchants, failure to answer a written confirmation of a contract within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against both parties under subsection (1). The only effect, however, is to take away from the party who fails to answer the defense of the statute of frauds; the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected.").

Nor does section 2-204(1) assist GOPAC. That subsection provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *Id.* § 2-204(1). In the circumstances, Fairbank's continuing placement of orders with GOPAC following McKee's June 3, 2009, email to Heacock cannot reasonably be construed as demonstrating Fairbank's agreement to the terms of the GOPAC Guarantee. As noted above, no discussion preceded the sending of the unsolicited June 3, 2009, email. While GOPAC points to evidence that the email was received and maintained in the business files of Fairbank's affiliate, American Food Service, *see* GOPAC's Reply SMF ¶ 18; Chen Aff. ¶ 9, it adduces no evidence that anyone at Fairbank even read the GOPAC Guarantee before filing it. To the contrary, as GOPAC itself notes, Fairbank's Heacock averred: "I reviewed my file and found the document. When it was received, I apparently had simply printed it and put it in my supplier file." GOPAC's S/J Reply at 3 (quoting Chen Aff. ¶ 9). Fairbank's continuing placement of orders is more

consistent with its reliance on the Fairbank Guarantee, which had been requested by Fairbank on February 19, 2009, and returned executed on March 5, 2009, than with any agreement to the terms of the unsolicited GOPAC Guarantee, which was filed unread and never was discussed by the parties.

Nor, finally, does section 2-206(1) help GOPAC. That provision provides, in relevant part, that "[u]nless otherwise unambiguously indicated by the language or circumstances . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances[.]" Neb. Rev. Stat. U.C.C. § 2-206(1)(a). For the reasons discussed above, continuing performance and lack of objection could not reasonably be construed in these circumstances as denoting acceptance of GOPAC's unsolicited offer.

Moreover, as Fairbank points out, the GOPAC Guarantee itself specified the means of its acceptance, requesting that the document be signed and returned to a certain individual. *See* Fairbank's S/J Opposition at 8; GOPAC Guarantee. It is undisputed that the GOPAC Guarantee never was executed by Fairbank. *See* Fairbank's Additional SMF ¶ 17; Chen Aff. ¶¶ 8-11. Thus, on that basis alone, no agreement was reached. *See, e.g., Wells, Waters & Gases, Inc. v. Air Prods. & Chems., Inc.*, 19 F.3d 157, 160 (4th Cir. 1994) ("The Agreement . . . explicitly conditioned acceptance by Air Products *at its general office*. Because the language of the Agreement unambiguously indicated otherwise, Air Products could not accept the Agreement by performance under [UCC] section 2-206(1)(b).") (emphasis in original); *Government Tech. Servs., Inc. v. Optional Sys. Res., Inc.*, No. CIV.A. 98C-09-203JEB, 2001 WL 755382, at *4 (Sup. Ct. Del. June 20, 2000), *aff'd*, 790 A.2d 476 (Del. 2002) (shipment of servers did not constitute acceptance of purchase order pursuant to Delaware's version of UCC § 2-206(1)(b) when seller "never accepted the purchase order by acknowledging the order through return mail, as instructed on the front of the

. . . purchase order.").

For all of the foregoing reasons, pursuant to Article 2 of the UCC, there is no disputed issue of material fact that the GOPAC Guarantee was and remained an unaccepted offer, never becoming a binding agreement between the parties. At all relevant times, the Fairbank Guarantee constituted the parties' effective agreement with respect to the subject matter of contractual indemnification.

### c. Scope of Indemnification Under Fairbank Guarantee

Pursuant to the Fairbank Guarantee, GOPAC promised to indemnify Fairbank and hold it harmless "from all claims, damages, causes of actions, suits, proceedings, judgments, charges, losses, costs, liabilities and expenses (including attorneys' fees) arising from any products (raw materials) as delivered to [Fairbank] by [GOPAC] that do not comply with the provisions of [Fairbank's] Raw Material Specifications[.]" Fairbank Guarantee.

GOPAC argues that, even assuming *arguendo* that the Fairbank Guarantee controls and that GOPAC breached its warranty by supplying adulterated meat, Fairbank is not entitled pursuant to Maine law to indemnification with respect to any damages attributable to Fairbank's own negligence or assessed against Fairbank on a strict liability claim. *See* GOPAC's S/J Motion at 1-13.

I have already determined, as a matter of law, that the Fairbank Guarantee controls. Fairbank adduces evidence that GOPAC breached its warranty to Fairbank by supplying meat products adulterated with *E. coli* O157:H7. *See, e.g.*, Fairbank's Opposing SMF ¶¶ 27-30, 32, 36. GOPAC disputes this, but for purposes of its motion for summary judgment, I view the evidence in the light most favorable to Fairbank, as nonmovant.

As Fairbank points out, *see* Fairbank's S/J Opposition at 11, GOPAC wrongly relies on Maine caselaw. "A federal court sitting in diversity must apply the conflict of law rules of the state

41

in which it sits, in this case, Maine." *Walker v. Unum Life Ins. Co. of Am.*, 530 F. Supp.2d 351, 353 (D. Me. 2008). "The state of Maine follows the Restatement (Second) of Conflicts of Laws and the 'most significant contacts and relationships' approach in determining choice of law." *Id.* (citations and internal quotation marks omitted). Fairbank's claims that GOPAC is contractually obligated to indemnify it for damages arising from GOPAC's alleged breach of express warranty implicate section 188 of the Restatement, which directs that in determining which state has the most significant contacts with respect to contract matters, courts should consider (i) the place of contracting, (ii) the place of negotiation of the contract, (iii) the place of performance, (iv) the location of the subject matter of the contract, and (v) the places of incorporation and business of the parties. *See* Restatement (Second) of Conflict of Laws § 188.

The contract in question was negotiated between GOPAC in Nebraska and Fairbank's affiliate in Pennsylvania. *See, e.g.*, Fairbank's Additional SMF ¶¶ 9-10; GOPAC's Reply SMF ¶¶ 9-10. Fairbank is a New York company with its principal place of business in Ashville, New York, and GOPAC is a Nebraska company. *See, e.g.*, Fairbank's S/J Opposition at 11; GOPAC's S/J Reply at 2. The products at issue were manufactured in, tested in, and shipped from Nebraska and delivered to New York. *See id.* GOPAC identifies only two connections between the instant action and Maine: that Maine is the forum state and that it is the domicile of the plaintiff/consumers who were injured by ingesting Fairbank products. *See* GOPAC's S/J Reply at 2. Maine patently is not the state with the most significant relationship to the third-party indemnification dispute at issue. Likewise, Pennsylvania has a more attenuated connection than either Nebraska or New York. The contact of "place of negotiation" is of less importance when, as here, there were no face-to-face meetings. *See* Restatement (Second) of Conflict of Laws § 188 cmt. e. I need not choose between

Nebraska and New York, both of which have significant connections to the instant dispute. Both parties agree that the result is the same pursuant to either body of law. *See* Fairbank's S/J Opposition at 11, 13; GOPAC's S/J Reply at 9, 13.[58]

GOPAC's reliance on non-UCC caselaw likewise is flawed. GOPAC argues that, rather than relying on the default damages rule codified at UCC § 2-715, the parties created their own indemnification contract, as Article 2 of the UCC permits. *See* GOPAC's S/J Reply at 6. GOPAC reasons that this removed the Fairbank Guarantee from the ambit of section 2-715, the UCC provision on which Fairbank relies. *See id.* Nonetheless, even in instances in which parties to the sale of goods create customized contract language, the resultant agreement is construed in accordance with the UCC. *See, e.g., Sundram Fasteners Ltd. v. Flexitech, Inc.*, No. 08-CV-13103, 2009 WL 2351763, at *6 (E.D. Mich. July 29, 2009) (under Michigan UCC, contract consists "of the terms upon which the parties agreed and any UCC gap fillers") (citation and internal quotation marks omitted); *In re Peaslee*, 913 N.E.2d 387, 390 (N.Y. 2009) (noting that a "broad interpretation of the term 'price' [in the parties' contract] to include negative equity furthers New York's policy that the UCC be liberally construed and applied to promote its underlying purposes and policies, including the continued expansion of commercial practices through custom, usage and agreement of the parties") (citations and internal quotation marks omitted).

Section 2-715 of the UCC provides, in relevant part, that consequential damages resulting from a seller's breach of warranty include:

> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

---

[58] For ease of reference, I cite Nebraska's UCC provisions.

(b) injury to person or property proximately resulting from any breach of warranty.

Nev. Rev. Stat. U.C.C. § 2-715(2).  Official commentary to section 2-715 clarifies that:

> In the absence of excuse under the section on merchant's excuse by failure of presupposed conditions, the seller is liable for consequential damages in all cases where he or she had reason to know of the buyer's general or particular requirements at the time of contracting.  It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part, nor is his or her obligation for consequential damages limited to cases in which he or she fails to use due effort in good faith.
>
> ***
>
> Any seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy.[59]
>
> ***
>
> Subsection (2)(b) states the usual rule as to breach of warranty, allowing recovery for injuries "proximately" resulting from the breach.  Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects.  If it was not reasonable for him or her to do so, or if he or she did in fact discover the defect prior to his or her use, the injury would not proximately result from the breach of warranty.

*Id.* cmts. 3, 5.

Although the Fairbank Guarantee does not use the term "consequential damages," the damages contemplated for breach of express warranty thereunder are similar in nature: "damages, . . . losses, costs, liabilities and expenses (including attorneys' fees) arising from any products (raw materials) as delivered to [Fairbank] by [GOPAC] that do not comply with the provisions of [Fairbank's] Raw Material Specifications[.]"  Fairbank Guarantee.

GOPAC argues that, pursuant to *non-UCC* Maine law, as well as *non-UCC* Nebraska and

---

[59] UCC § 2-719 provides, in relevant part: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."  Neb. Rev. Stat. U.C.C. § 2-719(3).

New York law, indemnification of a party for its own negligence or for strict liability damages is disfavored, and indemnification contracts are held not to encompass damages of that nature absent clear or even explicit language so indicating. *See, e.g.*, GOPAC's S/J Motion at 1-13; GOPAC's S/J Reply at 9-13.

Nonetheless, as a general matter, pursuant to Article 2 of the UCC an award of consequential damages for breach of warranty is favored. *See* Neb. Rev. Stat. U.C.C. § 2-719 cmt. 1 ("[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract."); *see also, e.g., Blommer Chocolate Co. v. Bongards Creameries, Inc*., 644 F. Supp. 234, 237 (N.D. Ill. 1986) (observing, in UCC breach of warranty case involving sale of salmonella-contaminated whey to chocolate manufacturer, "The whole point of obtaining a warranty is to get a product that will not have to be meticulously combed in a search for defects. The law protects that principle, not to mention consumers, by shifting the losses from any defect to the party best able to guard against defects, the party who made the product. If a buyer and seller are guilty of the same failures, but the seller has extended a warranty against those failures, the seller is liable.") (internal quotation marks omitted).

In turn, "[c]ourts have found that third-party claims may cause buyers consequential damages for which the seller should bear ultimate responsibility." *Glasstech, Inc. v. Chicago Blower Corp.*, 675 F.Supp.2d 752, 762-63 (N.D. Ohio 2009) (construing UCC § 2-715 to encompass recovery from seller of buyer's costs of settlement with customer for customer's costs of repairing defective fans). *Accord Pulte Home Corp. v. Parex, Inc.*, 942 A.2d 722, 732 (Md. App. Ct. 2008)

("A buyer who purchases defective goods may become liable to third parties if he resells the goods to them or the defect causes personal injury or property damage. Third-party claims may thus cause the buyer consequential damages for which the seller should indemnify him. These types of indemnity claims have been allowed in numerous [UCC] cases.") (citation and internal quotation marks omitted).

Nonetheless, as GOPAC argues in the alternative, *see* GOPAC's S/J Reply at 6-7, there are limits on the scope of consequential damages awardable pursuant to the UCC. These include, in material part, the requirement that any injury to person or property have proximately resulted from the breach of warranty. *See* Neb. Rev. Stat. U.C.C. § 2-715(2)(b); *see also id*. § 2-719 cmt. 1 ("[P]arties are left free to shape their remedies to their particular requirements and *reasonable agreements* limiting or *modifying* remedies are to be given effect.") (emphasis added). Fairbank effectively concedes the applicability of this limitation, arguing that its failure to discover the alleged presence of *E. coli* O157:H7 in GOPAC's raw materials does not undermine a finding pursuant to UCC § 2-715 that GOPAC proximately caused the plaintiffs' injuries. *See* Fairbank's S/J Opposition at 9-10.[60]

GOPAC contends that, assuming the applicability of section 2-715, it is entitled to summary

---

[60] Article 2 of the UCC does not necessarily displace the common law. *See, e.g*., Neb. Rev. Stat. U.C.C. § 1-103(b) ("Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity . . . supplement its provisions."); *see also, e.g., Mouradian v. Astoria Fed. Sav. & Loan*, 689 N.E.2d 1385, 1388 (N.Y. 1997) ("While the [UCC] allows the consideration of common-law and equitable principles, it does so '[u]nless displaced by the particular provisions of this Act.'") (quoting UCC § 1-103). However, in this case, the UCC's detailed specifications regarding the circumstances in which consequential damages may be awarded potentially clash with common-law contract construction principles, arguably displacing them. GOPAC fails to address the threshold question of whether, assuming the applicability of UCC § 2-715, resort to common-law principles of interpretation of express indemnity agreements, or for that matter, superseding/intervening negligence, is appropriate. *See generally* GOPAC's S/J Reply. In the absence of any such discussion, GOPAC falls short of demonstrating that these common-law principles have any bearing here.

judgment because (i) Fairbank had independent duties to provide for its product's safety, (ii) it was not reasonable for Fairbank to incorporate raw beef trim from GOPAC or any of its multiple suppliers into its product without testing for *E. coli* O157:H7, (iii) Fairbank's failure to conduct such testing constitutes negligence, and (iv) under section 2-715, Fairbank's negligence severs the proximate cause of the original breach. *See* GOPAC's S/J Reply at 7. Yet, Fairbank adduces evidence that it properly delegated the duty to test incoming raw meat products to its suppliers and that GOPAC was well aware of that delegation. *See, e.g.*, Fairbank's Additional SMF ¶¶ 1, 7-8; GOPAC's Reply SMF ¶¶ 1, 7-8; Fairbank's Additional SMF ¶¶ 4-5; Davis Email; *see also* FSIS Notice 05-09 (Docket No. 146-6, *Long*; Docket No. 123-6, *Smith*), Exh. 5 to Weber Aff./GOPAC S/J Motion, at 2 ("Establishments receiving, grinding, or otherwise processing raw beef products may use their Sanitation SOPs [standard operating procedures] *or other prerequisite programs* to prevent *E. coli* O157:H7. The establishment in its hazard analysis is to have supporting and ongoing documentation that establishes that the pathogen hazard is not reasonably likely to occur in its operation because of the design and execution of its prerequisite program. *Such prerequisite programs may include the use of purchase specifications*.") (emphasis added). Moreover, Fairbank performed finished-product testing that GOPAC concedes Fairbank was not required by federal law to perform. *See* GOPAC's SMF ¶ 17; Fairbank's Opposing SMF ¶ 17; Fairbank's Additional SMF ¶ 32; GOPAC's Reply SMF ¶ 32.

A trier of fact viewing the evidence in the light most favorable to Fairbank could find that Fairbank's failure to detect the presence of *E. coli* O157:H7 in the raw meat supplied to it was not unreasonable in the circumstances and, accordingly, was not the proximate cause of the plaintiffs' injuries. Therefore, GOPAC fails to demonstrate that it is entitled to summary judgment with respect

to all or any portion of Fairbank's contractual indemnification claims.

### d. Common-Law Indemnification

GOPAC seeks summary judgment as to Fairbank's common-law indemnification claims on grounds that (i) common-law indemnity is not available when an express contract for indemnification exists, and, (ii) if Fairbank is pleading common-law indemnity in the alternative, GOPAC is entitled to summary judgment on such claims because Fairbank was an "active" rather than "passive" tortfeasor. *See* GOPAC's S/J Motion at 17-20.

While it is true that common-law indemnification is available only in cases in which no express contract exists, *see, e.g., Gates-Chili Cent. Sch. Dist. v. State*, 389 N.Y.S.2d 716, 718 (N.Y. App. Div. 1976) ("*In the absence of an express contract*, the right to indemnity is said to rest upon an implied contract which arises by operation of law to prevent a result which may be unjust or unsatisfactory.") (citations omitted) (emphasis added), Fairbank is permitted to plead in the alternative, *see, e.g., Frontier Commc'ns Corp. v. Barrett Paving Materials, Inc.*, 631 F. Supp.2d 110, 114 (D. Me. 2009). GOPAC articulates no reason why Fairbank should be required at this juncture to elect between its contractual and common-law indemnification claims.

Nor does GOPAC demonstrate entitlement to summary judgment on the merits of Fairbank's alternative common-law indemnification claims. The United States District Court for the Southern District of New York has explained:

> [I]ndemnification may be required as a matter of law based on a great disparity in the fault of the parties, even in the absence of an express indemnity agreement or the implication of indemnity on account of the parties' relationship to one another. This "tort indemnity" may apply even when both parties are at fault, so long as the forms of fault differ greatly in gravity, such as when the party seeking indemnification is merely "passively negligent" but the indemnitor is "actively negligent." Active negligence is the creation of an unreasonable risk; passive negligence is the failure to discover or remedy a risk created by a joint tortfeasor.

48

*In re Complaint of Kreta Shipping, S.A.*, No. 96 Civ. 1137(KMW), 2000 WL 33249253, at *3 (S.D.N.Y. June 21, 2000) (citations and internal quotation marks omitted).

GOPAC posits that Fairbank was an "active tortfeasor," barring its recovery, in that it functioned as much more than a passive conduit, having fashioned meat from multiple suppliers into finished meat products in circumstances in which its preventive measures to control food safety hazards, including its *E. coli* O157:H7 testing protocol, failed to meet the standard of care. *See* GOPAC's S/J Reply at 15-17. Nonetheless, as discussed above, Fairbank disputes this, asserting that it was at most a "passive tortfeasor," having failed to detect GOPAC's misfeasance after it properly relied on and paid GOPAC to conduct testing of incoming raw materials and undertook its own finished product testing even in the absence of a federal requirement that it do so. *See* Fairbank's S/J Opposition at 25-28.

A trier of fact viewing the cognizable evidence in the light most favorable to Fairbank reasonably could concur with this assessment. GOPAC accordingly fails to demonstrate entitlement to summary judgment with respect to Fairbank's alternative common-law indemnification claims.

## III. Conclusion

For the foregoing reasons, I **DENY** GOPAC's motion to exclude in whole or in part the opinions of Fairbank's experts and recommend that the court **DENY** both the Fairbank and GOPAC motions for summary judgment.

## IV. Sealing of This Decision

I **DIRECT** the Clerk of the Court to seal this opinion when docketed. The parties shall notify me by noon on Friday, June 3, 2011, with due regard to the public's interest in access to court

proceedings, whether this opinion contains any confidential information that should remain sealed and, if so, indicate explicitly what language is proposed to be redacted, and why. If I do not hear from the parties by noon on Friday, June 3, 2011, this opinion will be unsealed.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of May, 2011.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge